CONFEDERATED TRIBES OF the UMA-
TILLA INDIAN RESERVATION, Pen-
dleton, Oregon, and Gilbert E. Conner,
Sam Kash Kash, Thelma M. Reick, Jo-
seph A. Sheoships, David S. Hall, Louis
F. McFarland, Joseph T. Johnson, Louis
G. Crane and Bryson G. Liberty, each
on its or his own behalf and as repre-
sentative of the members of the Con-
federated Tribes of the Umatilla Indian
Reservation, Pendleton, Oregon, Plain-
tiffs,

v.

H. G. MAISON, Salem, Oregon, individ-
ually and as Superintendent, Depart-
ment of State Police of the State of
Oregon, Robert Y. Thornton, Salem,
Oregon, individually and as Attorney
General of the State of Oregon, John
Amacher, Roseburg, Oregon, Tallan
Greenough, Coquille, Oregon, Wayne
Phillips, Baker, Oregon, Joseph W.
Smith, Klamath Falls, Oregon, and J.
Pat Metke, Bend, Oregon, individually
and as members of the State Game
Commission of the State of Oregon, and
George L. Anderson, Jr., LaGrande, Ore-
gon, individually and as District Attor-
ney of Union County, Oregon, Defend-
ants.

Civ. No. 64–317.

United States District Court
D. Oregon.

Aug. 8, 1966.

Mark C. McClanahan, King, Miller,
Anderson, Nash & Yerke, Portland, Or.,
for plaintiffs.

Theodore H. Little, Clarkston, Wash.,
for the Nez Perce Indian Tribe of Idaho,
amicus curiae.

Robert Y. Thornton, Atty. Gen. for
Oregon, Salem, Or., Roy C. Atchison,
Asst. Atty. Gen., Portland, Or., John
J. O'Connell, Atty. Gen. for Washington,
J. L. Coniff and Mike Johnston, Asst.
Attys. Gen., Olympia, Wash., for de-
fendants.

OPINION

SOLOMON, District Judge:

The Confederated Tribes of the
Umatilla Indian Reservation and nine
individual tribesmen brought this action
for declaratory judgment and an injunc-
tion against the Oregon Game Commis-
sion and various State law enforcement
officials. They contend that State reg-
ulations which restrict hunting, partic-

872

ularly for deer and elk, cannot be applied to them so long as they confine their hunting to the area covered by their tribe's treaty with the United States, executed June 9, 1855, 12 Stat. 945. They claim that the treaty allows them to hunt without restriction on lands not claimed by settlers which border their reservation, including the lands now designated as the Umatilla and Whitman National Forests. They rely on Article I of the treaty which provides:

> "That the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians, and at all other usual and accustomed stations in common with citizens of the United States, and of erecting suitable buildings for curing the same; *the privilege of hunting*, gathering roots and berries and pasturing their stock *on unclaimed lands in common with citizens, is also secured to them.*" (Emphasis supplied.)

In Confederated Tribes of Umatilla Indian Reservation v. Maison, et al., D.C., 186 F.Supp. 519, 520, I construed this article to mean that the State may not restrict the off-reservation fishing rights set forth in the treaty without showing that such restriction was necessary for conservation of the fish. The Court of Appeals in affirming this decision laid down the test to be applied to State-imposed restrictions of treaty rights:

> "* * * while a restriction of the fishing activities of the plaintiffs must be *indispensable*, * * * a restriction of the fishing activities of other citizens is valid if merely *reasonable* * * *" (9 Cir., 314 F.2d 169, 174, emphasis in original)

Defendants assert that *Confederated Tribes*, supra, was incorrectly decided in both the District Court and the Court of Appeals because neither Court followed Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896). There the Supreme Court upheld Wyoming's right to prosecute an Indian for killing elk off the reservation in spite of a treaty

guarantying off-reservation hunting rights to members of his tribe. The Court held that the admission of Wyoming into the Union was a Congressional Act which modified the treaty to permit Wyoming to become a state on an equal footing with the other states.

In other words, defendants here contend that in spite of the provisions of the treaty, the Indians have no greater rights to fish and hunt off their reservation than any other Oregon citizen. This contention was made and rejected in United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); Tulee v. State of Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 115 (1942); and Makah Indian Tribe v. Shoettler, 192 F.2d 224 (9th Cir. 1951).

*Race Horse* can be distinguished from those cases in which the treaty was ratified by Congress after the state was admitted to the Union. In each of these cases it was unnecessary to modify treaty rights in order to permit the state to be admitted to the Union on an equal footing with all other states.

No one disagrees with the defendants' argument that regulation of fish and game resources is necessary and desirable, and that an intolerable situation would arise if all citizens were permitted to fish or hunt without restriction. However, the issue here is whether a State is permitted to proscribe or limit the treaty rights of Indians without showing that such restriction is indispensable. *Confederated Tribes*, supra.

In this case experts testified that there were approximately 177 Indians who were active hunters of deer and elk; these hunters kill approximately 150–175 elk and 300–350 deer per year. The meat of these animals is shared among the families of the tribe and is used solely for their subsistence.

In contrast, sportsmen killed 9,055 elk and 24,222 deer in Northeastern Oregon in 1963. There was evidence that the hunter success ratio was about 30 per cent for elk and 50 per cent for deer. Therefore, approximately 30,000 elk tags

and 45,000–50,000 deer licenses were issued that year to sportsmen for hunting in Northeastern Oregon.

In spite of this large harvest, the evidence indicates that the populations of both deer and elk are in healthy condition, and have increased steadily since 1950. In fact, overpopulation of deer and elk is causing damage to the winter range in some areas.

If the State, either now or at some future time, believes that too many deer and elk are being harvested, it should issue fewer permits to sportsmen.

Defendants also contend that national forest lands are not "unclaimed" within the meaning of the treaty. The minutes of the Walla Walla Treaty Council of June, 1855, show that the Indians were reluctant to abandon their vast lands to go on a reservation of 290,000 acres. Confronted by this reluctance, Governor Stevens explained:

> "You will be allowed to pasture your animals on land not claimed or occupied by settlers * * * and to kill game on land not occupied by whites; all this outside the reservation."

Later in the negotiations, Governor Stevens said to Chief Looking Glass,

> "Looking Glass knows that * * * he can kill game * * * when he pleases * * * on any of the lands not occupied by settlers."

The minutes of the Treaty Council leave no doubt that both parties thought the Indians were getting the right to hunt on lands near the reservation not actually occupied by white settlers. Provisions in treaties with Indians must be construed as the Indians understood them at the time of the agreement.

To construe "unclaimed lands" to exclude land not occupied by white settlers would violate the solemn promise made to the Indians more than a century ago.

Plaintiffs are directed to submit findings of fact, conclusions of law, and a judgment in favor of plaintiffs, all in accordance with this opinion.