[No. 42450.    En Banc.    February 15, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL RODGER CHAMBERS, *Appellant.*

*James B. Hovis* (of *Hovis, Cockrill & Roy*), for appellant.

*Slade Gorton, Attorney General, J. L. Coniff, Assistant,* and *Jay Roy Jones, Prosecuting Attorney*, for respondent.

STAFFORD, J.—Michael Chambers was convicted of hunting deer without a valid Washington State hunting license in his possession. He appeals.

There is substantial evidence that on October 11, 1969, during the open deer season, appellant killed a spiked buck mule deer in the Couse Creek area of Asotin County. Appellant's counsel admitted, in oral argument, that the area in which the kill took place was at least 40 miles from the nearest territory ceded to the United States government by the Yakimas in the Treaty of 1855.

The land on which the deer was killed and from which it was removed was privately owned by a Mrs. Weissenfels. An unoccupied house was located thereon, approximately a third to a half mile from the scene. The property was range land entirely enclosed by a barbed wire fence. It was necessary for one to climb over the fence or to go through the gate to gain entry. Although appellant does not recall climbing the fence, he admits that there could have been one.

The fence enclosing the Weissenfels property was neither posted with Game Department signs authorizing permissive hunting nor with "no trespassing" or "no hunting" signs. There is some evidence that adjacent land owned by a Mr. Floch may have been posted with signs furnished by the Game Department under its sportsman-farmer program. If the Floch land was posted, such signs would have indicated that the owner of the posted land had opened it to hunters by permission. There is no government land in the immediate vicinity.

At the time the deer was killed, appellant did not possess a valid Washington State hunting license as required by RCW 77.32.010. He was, however, an enrolled member of the Confederated Tribes and Bands of the Yakima Indian Reservation. When he was arrested appellant presented the game protector with proof of his enrolled status. It was appellant's position then, as well as now, that he was entitled to hunt without a license, pursuant to the provisions of

the Treaty of 1855 (12 Stat. 951 (1859)). Article 3 of the treaty reads in part:

> The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with the citizens of the Territory, and of erecting temporary buildings for curing them; *together with the privilege of hunting,* gathering roots and berries, and pasturing their horses and cattle *upon open and unclaimed land.*

(Italics ours.)

The central question is whether article 3 of the treaty entitled appellant to kill the deer, as he did, without a state hunting license, on fenced private property, and off the reservation.

During the trial the court admitted minutes of the proceedings that gave rise to the treaty. The trial judge used them as an aid for understanding article 3 which in turn gave rise to instruction 4A. The court refused, however, to submit the treaty minutes to the jury for the purpose of enabling them to make their own interpretation of article 3.

Appellant concedes that the proper legal interpretation of article 3 is technically a matter of law. Nevertheless, he assigns error to the trial court's refusal to submit the minutes and contends "the ends of justice would have been better served to allow them [the jury] to observe the documents upon which their deliberation must . . . be based."

■■ The trial court did not err. The proper construction and interpretation of article 3 was a matter of law to be resolved by the trial court and not by the jury. RCW 10.46.070; RCW 4.44.080; *State v. Comer,* 176 Wash. 257, 266, 28 P.2d 1027 (1934); *State v. Richards,* 97 Wash. 587, 167 P. 47 (1917). It is the duty of the jury to accept the court's statement of the law, regardless of what the jurors personally may believe the law is or ought to be. On the other hand, it is the province of the jury to apply the facts to the court's

declaration of the law. RCW 10.46.070, RCW 4.44.090. It would have been error for the trial court to submit the minutes to the jury and, thus assign to it the additional duty of resolving the questions of law inherent in the factual situation.

Appellant also assigns error to the trial court's refusal to permit Mr. Louis Cloud to testify concerning an asserted interpretation of the treaty by the Indian signatories in 1855. Mr. Cloud is a member of the Yakima tribal council and chairman of several tribal committees.

Appellant's offer of proof reveals that Mr. Cloud's testimony was presented solely for presentation to the *jury*. It was submitted to aid the jurors in their interpretation of that part of article 3 which refers to an Indian's right to hunt "upon open and unclaimed land". This, of course, is the very subject upon which the trial court was required to instruct the jury. Had the jury been permitted to hear the proffered testimony, the legal meaning of the questioned phrase could have dissolved into a state of utter confusion. Conceivably the jury could have construed article 3 in a manner quite differently from that given it in the court's instruction. For this reason it would have been error for the trial court to abdicate its responsibility by assigning to the jury the duty of resolving the central question of law.

■ Appellant did not offer the testimony to be heard in the absence of the jury as an aid to the *court* in formulating an instruction concerning the meaning of the questioned phrase. While such consideration might have provided a logical interpretive aid, no such offer of proof was made. Thus, we may not speculate upon whether the testimony should have been received for that limited purpose. *State v. Pierce*, 175 Wash. 523, 27 P.2d 1087 (1933); *State v. Myers*, 47 Wn.2d 840, 290 P.2d 253 (1955); *State v. Rakes*, 2 Wn. App. 833, 472 P.2d 399 (1970).

Appellant asserts the trial court erred in its failure to give his proposed instructions 7, 8, 9, 10, 11 and 12. We do not agree. The trial court correctly refused to give them. Each was a proposed rule to aid the jury in interpreting or

construing Indian treaties. Assuming, without deciding, that they correctly state abstract rules for the construction or interpretation of such treaties, they should be used only by the trial court in formulating the law upon which to instruct the jury. RCW 10.46.070; RCW 4.44.080; *State v. Comer, supra; State v. Richards, supra.* As indicated earlier, it would have been error to submit such rules of construction or interpretation to the jury. This would have left to the jury the duty of interpreting the treaty and, thus, declaring the ultimate law based upon the jury's own interpretation thereof.

██ Appellant's exception to the court's failure to give his proposed instruction 14 is not well taken. It is grounded upon the mere statement that it is a correct statement of the law. Such an exception is not sufficient. *State v. Lyskoski,* 47 Wn.2d 102, 287 P.2d 114 (1955).

██ Appellant assigns error to the court's refusal to give his proposed instruction 15 which reads:

In determining what "Occupied" means you are instructed that the definition in Webster's Dictionary is as follows: *To engage the attention or energies of;* to fill up (an extent in space or time); to take or hold possession of; to reside in as an owner or tenant.

(Italics ours.) Assuming the abstract definition is correct, clearly the italicized portion is not proper. It fails to apply to the subject of occupying, holding or possessing land. The trial court is not called upon to revise a proposed instruction to make it properly applicable. *Ste. Marie v. Command,* 60 Wn.2d 189, 373 P.2d 121 (1962); *see also Mannisto v. Boeing Airplane Co.,* 60 Wn.2d 304, 373 P.2d 496 (1962).

The trial court properly rejected the instruction for another reason. There was no apparent logic for giving the instruction and no valid reason for giving the instruction was disclosed. The sole explanation for taking exception to the court's refusal to give the proposed instruction was that it is "a definition of 'Occupied' which should be before the jury." The word "occupied" defined in the proposed in-

struction does not appear in any instruction given by the trial court or in any proposed instruction of appellant to which an exception was taken. Further, it does not appear in article 3 of the treaty. Thus, the exception was insufficient under CR 51(f); *State v. Scott*, 77 Wn.2d 246, 461 P.2d 338 (1969).

■ Error is assigned to the giving of instruction 4A which reads:

> You are instructed that the Treaty with the Yakima of 1855 was made between the United States Government and various Indian tribes. The treaty provided that members of said tribes possessed the privilege of *hunting on open and unclaimed lands.* Open and unclaimed lands, within the meaning of the Treaty with the Yakima, is defined to mean *lands which are not in private ownership.* If you find beyond a reasonable doubt that the defendant was engaged in a hunting activity *on lands in private ownership with outward indications of such ownership observable to a reasonable man,* as distinguished from governmental ownership, then you shall find the defendant guilty as charged.

(Italics ours.)

Appellant's principal objection is that the instruction defines "open and unclaimed lands", as used in article 3 of the treaty, in terms of "lands which are not in private ownership". He argues that this misinforms the jury as to the extent of appellant's treaty rights and is a limitation found neither in the treaty nor in the minutes of the treaty.

Appellant concedes that:

> Webester's Seventh New Collegiate Dictionary has as one of its definitions of the word "open"; "*characterized by ready accessibility and cooperative attitude*". A second definition from that same volume is "*so arranged as to permit ingress, egress, or passage; as having no enclosing or confining barrier; not shut or fast*". "Unclaimed" is defined as "*free from claim, as land not staked out by anyone*".

Without question the foregoing is the commonly accepted English usage of the words in question. Appellant argues, however, that while one educated in the white man's cul-

ture would accept such usage, the treaty must be construed as the unlettered Indian would have understood it, without technical rules of construction. Thus, appellant contends, we must consider the conditions as they existed at the time of the treaty.

The pertinent portion of article 3 and the minutes thereof disclose that two independent rights were involved. One was the tribal right of the Indian to wander, gather roots and berries, pasture his livestock and to hunt. The other was the right of the white settler to privacy in the use of the land he had acquired and staked out. The presence of both settlers and Indians in the same territory and the possibility of conflict, if demarcation of landownership remained undetermined, was recognized. For example, the treaty minutes provided, at folio 111:

> [A]lthough we may live near together there should be a line of distinction drawn so that the Indian may know where his land is and the white man where his land is; you are all able to judge for yourselves by the constant difficulties that are occurring here among you, between the whites and the Indians.

The treaty was but a commonsense resolution of the foregoing problem, as it then existed between the settlers and the Indians, and as it would most logically have been understood. In other words, there was one territory that was expected to have a dual use by both white settlers and Indians. Neither article 3 nor the minutes of the treaty are inconsistent with a recognition of such a dual use and a need for mutual protection of those rights.

The treaty obviously extinguished some tribal rights in the land then under consideration. The problem is the extent thereof.

While article 3 reserved to the Indians the right of "taking fish *at all usual and accustomed places,* in common with the citizens of the territory . . ." (italics ours) the other rights of gathering roots and berries, pasturing livestock and hunting were confined to *"open and unclaimed land."* (Italics ours.) This then left them free to wander at will, to

pick roots and berries, pasture their livestock and hunt as they had from the beginning of time. They were restricted only in those areas staked out by the white man as his own place to settle. This is both logical and consistent with article 3 and the treaty minutes. For example, the minutes provide in part, at folio 123:

> They shall have the same liberties outside the Reservation *to pasture animals on land not occupied by whites, to kill game,* to get berries and to go on the roads to market.

(Italics ours.)

Further, at folio 139, the treaty minutes provide in part:

> Gov. Stevens. I will ask of Looking Glass whether he has been told of our council. Looking Glass knows that *in this reservation settlers cannot go,* that *he can graze his cattle* outside of the reservation *on lands not claimed by settlers,* that he can catch fish at any of the fishing stations, *that he can kill game* and go to Buffalo when he pleases, that *he can get roots and berries on any of the lands not occupied by settlers.*

(Italics ours.)

A review of article 3 reveals that it reasonably reflects the tenor of the minutes. Further, the trial court did not commit error by interpreting the tribal rights of Indians to hunt under the terms of article 3. On the contrary, instruction 4A quite reasonably provided for the modern Indian's protection. It required not only that the land be in private ownership but that there be "outward indications of such ownership observable to a reasonable man" thus, preventing entrapment of an unwary Indian hunter. This accorded to appellant all hunting rights he possessed under the treaty.

The trial court is affirmed.

FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, and UTTER, JJ., concur.

HALE, C.J., concurs in the result.

Petition for rehearing denied May 21, 1973.