No. 13190

IN THE SUPREME COURT OF THE STATE OF MONTANA

1977

STATE OF MONTANA,

Plaintiff and Appellant,

-vs-

LASSO STASSO,

Defendant and Respondent.

Appeal from: District Court of the Fourth Judicial District,
Honorable Jack L. Green, Judge presiding.

Counsel of Record:

For Appellant:

Robert L. Fletcher, County Attorney, Thompson Falls,
Montana
Clayton Herron argued, Helena, Montana

For Respondent:

Victor F. Valgenti argued, Missoula, Montana
Richard A. Baenen, Washington D.C.

Submitted: January 19, 1977

Decided: APR 21 1977

Filed: APR 21 1977

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Defendant Lasso Stasso, a duly enrolled member of the Confederated Salish and Kootenai Indian Tribes, was convicted in justice court, Thompson Falls, Montana, of a violation of the game laws of Montana. The specific charge was killing a deer out of season. This conviction was appealed to the district court and was set aside and the charges dismissed. The state appeals.

The trial de novo in the district court was held January 27, 1975. These facts were stipulated by the parties:

1. Defendant, Lasso Stasso, is a duly enrolled member of the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana. The Confederated Tribes were parties to the Treaty of Hell Gate of July 16, 1855, 12 Stat. 975, with the United States.

2. Defendant shot and killed a deer on August 24, 1972, in the general vicinity of White Pine Creek, Sanders County, Montana. At the time of the incident the season was closed for hunting deer, pursuant to Montana law.

3. That the location is outside the boundaries of the Flathead Reservation, as established by Article II of the Treaty of Hell Gate of July 16, 1855, but within National Forest Service lands which have never been patented to any private person.

The state relied solely on the stipulated facts. Defendant, however, presented the testimony of an expert witness and exhibits clearly outlining the aboriginal hunting territory of the Confederated Salish and Kootenai Tribes. The evidence indicated the deer was taken within this aboriginal hunting territory, but without the confines/the present day Flathead Reservation.
of

The district court found the lands upon which the offense occurred were open and unclaimed lands under the Treaty of Hell Gate and provisions of the treaty are superior to any reserved power of the state and therefore exempt from state regulation. The complaint was dismissed for failure to state the commission of a public offense.

The issue to be decided is whether present day members of the Confederated Salish and Kootenai Tribes have a right to hunt free from the regulation of Montana game laws, on "open and unclaimed lands" by virtue of Article II of the Treaty of Hell Gate. In determining this issue, we first consider whether Forest Service land may be included within the meaning of "open and unclaimed lands".

The concept of aboriginal title to lands historically occupied by American Indians is recognized in Sac and Fox Tribe v. United States, 383 F.2d 991,997 (Ct.Cl.1967), cert.den. 389 U.S. 900, 88 S.Ct.220, 19 L ed 2d 217, where the court stated:

> "* * * the right of sovereignty over discovered land
> was always subject to the right of use and occupancy
> and enjoyment of the land by Indians living on the
> land. This right of use and occupancy by Indians came to
> be known as 'Indian title.' It is sometimes called
> 'original title' or 'aboriginal title.'"

Hunting and fishing rights are part and parcel with aborginal title. State v. Coffee, (Idaho 1976), 556 P.2d 1185.

Aboriginal title is founded on the concept that Indian occupancy and use of the land prehistorically predated the present sovereign. This being so, we examine the terms by which the Indians ceded their land to the United States to determine to what extent Indian hunting rights on that land remain unextinguished.

The parties stipulated the Conferedated Salish and Kootenai Tribes, of which the defendant is a member, were parties to the Treaty of Hell Gate. This treaty was executed on July 16, 1855 at Hell Gate in the Bitter Root Valley. Isaac I. Stevens, governor and superintendent of Indian affairs for the Territory of Washington represented the United States. Representative chiefs, headmen, and delegates of the Flathead, Kootenay, and Upper Pend d'Oreilles Indian Tribes signed for them.

Through the provisions of Article I of this treaty, the Indians ceded all their lands to the United States:

> "ARTICLE I. The said confederated tribes of Indians hereby cede, relinquish, and convey to the United States all their right, title, and interest in and to the country occupied or claimed by them, bounded and described as follows * * *."

The treaty further provided that in exchange for the cession of their lands the Indians were to receive a reservation and monetary compensation. In addition Article III of the Treaty provided the Indians were to receive:

> "The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." (Emphasis added).

This Court speaking of the Treaty of Hell Gate of July 16, 1855 in State v. McClure, 127 Mont. 534,539/541, 268 P.2d 629, recognized that, when they signed the treaty:

> "* * * the Flathead and other prairie Indian nations' primary interest was to protect and reserve their hunting rights and grounds which provided their major food and clothing. * * *.

> "* * *

- 4 -

"* * * Also assured was the Indians's right to hunt and take game outside the reservation on all open and unclaimed lands. * * *"

The state argues the Montana Territorial Act of May 26, 1864, 13 Stat. 85, has in some way abrogated or affected the rights reserved to the Tribes by the Treaty of Hell Gate. This is not the case. The language of that Act states in pertinent part:

"That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory so long as such rights shall remain unextinghished by treaty between the United States and such Indians * * *."

The application of the provisions of the Treaty of Hell Gate to a fact situation such as the instant case is a matter of first impression in this jurisdiction. It is clear however that the provisions of the treaty must be considered as a reservation by the Indians, rather than a grant by the federal government. Therefore, the Indians, at the time of the treaty, reserved the right to hunt on open and unclaimed lands outside their present day reservation, but within their aboriginal hunting territory. The determination remaining to be made is--to what extent does this reservation of right remain unextinguished?

Idaho courts have decided the instant question in that jurisdiction. In view of the striking similarities of the fact pattern of the Idaho cases with the instant case, these cases will be discussed here.

State v. Arthur, 74 Idaho 251, 261 P.2d 135, 143, involved an attempt by the state of Idaho to enforce its hunting laws against a member of the Nez Perce Tribe who killed a deer out of season on National Forest land. The incident occurred outside the boundaries of the reservation, but within the area ceded to the

- 5 -

federal government by the Tribe.  The treaty provisions involved in <u>Arthur</u> were identical to Article III of the Treaty of Hell Gate. The Supreme Court of Idaho rejected the state's attempt to enforce the hunting laws upon the Indian-defendant:

> "We are not here concerned with the wisdom of the provisions of the treaty under present conditions nor with the advisability of imposing upon the Indians certain regulatory obligations in the interest of conserving wild life; that is for the Federal Government, the affected tribe, and perhaps the State of Idaho to resolve under appropriate negotiations; our concern here is only with reference to protecting the rights of the Indians which they reserved under the Treaty of 1855 to hunt upon open and unclaimed land without limitation, restriction or burden.
>
> "We hold that the rights reserved by the Nez Perce Indians in 1855, which have never passed from them to hunt upon open and unclaimed land still exist unimpaired and that they are entitled to hunt at any time of the year in any of the lands ceded to the federal government though such lands are outside the boundary of their reservation. * * *"

State v. Tinno, 94 Idaho 759, 497 P.2d 1386, 1391, is in accord with <u>Arthur.</u>  In <u>Tinno</u> a member of the Shoshone-Bannock Tribes was charged with taking a chinook salmon with a spear in violation of Idaho fishing regulations.  The Idaho Supreme Court found the Tribes' treaty gave the right to hunt and fish on unoccupied lands of the United States even though fishing was not specifically mentioned in the language of the treaty:

> "The signatory Indians had roamed at will and essentially in peace among themselves.  They did not in a strict sense occupy the land they roamed; they harvested game, fish, and berries, camas roots, and other natural foods and moved about with the seasonal changes.  In agreeing to settle on a permanent basis they still were expecting rights to harvest food on the unsettled lands as a means of subsistence and as an integral part of their way of life.
>
> "* * * In order to be fair we must attempt to give effect to the terms of the treaty as those terms were understood by the Indian representatives* * *."

State v. Coffee, (Idaho 1976), 556 P.2d 1185, was decided in November 1976. In Coffee a member of the Kootenai Tribe was charged with the killing of two deer out of season on private property. The Idaho Supreme Court affirmed the district court conviction on the grounds the Tribe's aboriginal hunting right only applied to open and unclaimed lands and not to lands owned by private parties.

We find the Idaho cases interpreting Indian treaties containing language dealing with Indian hunting rights common to the Treaty of Hell Gate persuasive in the instant case. Article III of the Treaty of Hell Gate reserves for present day members of the tribes signing that document the right to hunt game animals free from state regulation on lands ceded by the tribes to the federal government. However, it is clear this right is limited to land which is open and unclaimed at the time of the incident. Land owned or occupied by private parties is in no way open and unclaimed within the contemplation of this treaty.

Prima facie, all persons within this state are subject to its criminal laws and come within the jurisdiction of its courts. If an exception exists it must be shown by the defendant. State v. Spotted Hawk, 22 Mont. 33, 55 P. 1026; State v. Buckaroo Jack, 30 Nev. 325, 96 P. 497. Therefore in the instant case defendant had the burden of proving the alleged offense was committed at a location which deprived the state of jurisdiction to prosecute.

In State v. Arthur, 74 Idaho 251, 261 P.2d 135,141, the term "open and unclaimed lands" was interpreted as:

> "* * *lands as were not settled and occupied by the whites under possessory rights or patent or otherwise appropriated to private ownership and was not intended to nor did it exclude lands title to which rested in the federal government * * *."

We find this definition persuasive in light of the fact that the treaty interpreted in <u>Arthur</u> was identical to the Treaty of Hell Gate.

We find the National Forest lands involved herein are open and unclaimed lands. State v. Arthur, supra; Confederated Tribes of Umatilla Indian Res. v. Maison, 262 F.Supp. 871 (D.Ore.1966), affirmed in Holcomb v. Confederated Tribes of Umatilla Indian Res., 382 F.2d 1013 (9th Cir. 1967).

The judgment of the district court is affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices.