[No. 49845–8.   En Banc.   October 11, 1984.]

THE STATE OF WASHINGTON, *Respondent*, v. DELBERT W. MILLER, ET AL, *Petitioners*.

*Delbert Miller,* pro se, and *Robert D. Wilson–Hoss* (of *Wilson–Hoss, Sheldon & Hoss*), for petitioners.

*Gary P. Burleson, Prosecuting Attorney,* and *L. Frank Johnson, Deputy,* for respondent.

UTTER, J.—This consolidated case arises from petitioners' conviction of illegally killing and possessing an elk out of season in violation of RCW 77.16.020 and 77.16.030.[1] The trial court held that petitioners, members of the Skokomish Indian Tribe, had not adequately met their burden of proving that the game regulations were not "reasonably necessary" to conservation. We find that the trial court applied the wrong standard in making its determination and reverse.

Petitioners, Delbert Miller and Lloyd D. Wilbur, Sr., stipulated to shooting a cow elk in the Olympic National Forest during a season closed to such hunting. They asserted they were guaranteed the right to hunt in this

---

[1] RCW 77.16.020 provided, in pertinent part,

"(1) It is unlawful to hunt, fish, possess, or control a species of game bird, game animal, or game fish during the closed season for that species except as provided in RCW 77.16.030."

RCW 77.16.030 provided:

"Except as otherwise provided in this title, a person who has lawfully acquired possession of wildlife and who desires to retain or transfer it may do so in accordance with the rules of the commission."

area, free of state regulation, by the Point No Point Treaty of 1855. Petitioners also claimed that they were guaranteed the right to take this one elk for a religious ceremony under the free exercise clause of U.S. Const. amend. 1.

The trial court heard testimony of Dr. Max Zahn, acting regional biologist for the State Department of Game, who explained the method and conservation goals which the Department uses to determine when to open and close hunting seasons in certain regions. Based upon this expert's testimony and upon the standard set forth in *State v. Byrd,* 29 Wn. App. 339, 628 P.2d 504 (1981), the court held the regulations were "reasonably necessary" to conservation and, thus, valid as applied to petitioners.

The District Court's ruling was summarily affirmed in the superior court. Petitioners filed a notice of discretionary review in the Court of Appeals which certified the case to this court due to an apparent conflict between *State v. Byrd, supra; State v. Stasso,* 172 Mont. 242, 563 P.2d 562 (1977); *Holcomb v. Confederated Tribes,* 382 F.2d 1013 (9th Cir. 1967); and *State v. Arthur,* 74 Idaho 251, 261 P.2d 135 (1953). We accepted certification to set forth the appropriate standard for determining whether a state hunting regulation is a valid exercise of the State's police power when applied to rights guaranteed to Indians by treaty with the federal government.[2]

Article 4 of the Point No Point Treaty of 1855 provides:

> The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, in common with all citizens of the United States; and of erecting temporary houses for the purpose of curing;

---

[2]The parties stipulated that petitioners killed the elk on national forest land. Several courts have determined that such land is "open and unclaimed" within the meaning of the treaty. *Confederated Tribes v. Maison,* 262 F. Supp. 871, 873 (D. Or. 1966), *aff'd sub nom. Holcomb v. Confederated Tribes, supra; see also State v. Chambers,* 81 Wn.2d 929, 506 P.2d 311, *cert. denied,* 414 U.S. 1023 (1973); and *State v. Arthur, supra.* Respondent does not dispute or question this interpretation on appeal. *But see United States v. Hicks,* 587 F. Supp. 1162 (W.D. Wash. 1984) (order reinstating action) (national park not "open and unclaimed" within meaning of treaty).

*together with the privilege of hunting and gathering roots and berries on open and unclaimed lands.*

(Italics ours.) 12 Stat. 933, 934.

This same provision was inserted in many treaties negotiated between Governor Isaac Stevens and native American Indians of the Pacific Northwest. *See generally United States v. Washington,* 384 F. Supp. 312, 353-57 (W.D. Wash. 1974), *aff'd,* 520 F.2d 676 (9th Cir. 1975), *cert. denied,* 423 U.S. 1086 (1976).

The meaning and legal impact of the treaty provision reserving the Indians' aboriginal "right" to take fish on lands ceded by them to the federal government has been the subject of several United States Supreme Court cases, *see Puyallup Tribe v. Department of Game,* 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725, *reh'g denied,* 393 U.S. 898, 21 L. Ed. 2d 185, 89 S. Ct. 64 (1968) (*Puyallup* I); *Department of Game v. Puyallup Tribe,* 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973) (*Puyallup* II); *Puyallup Tribe, Inc. v. Department of Game,* 433 U.S. 165, 53 L. Ed. 2d 667, 97 S. Ct. 2616 (1977) (*Puyallup* III); *Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055, *modified on other grounds sub nom. Washington v. United States,* 444 U.S. 816, 62 L. Ed. 2d 24, 100 S. Ct. 34 (1979). The meaning of the provision guaranteeing "the privilege of hunting . . . on open and unclaimed lands" has also received some judicial attention. *See State v. Byrd, supra; State v. Stasso, supra; Holcomb v. Confederated Tribes, supra; State v. Arthur, supra.*

States are bound, by the supremacy clause, to respect the terms of treaties entered into by Congress. U.S. Const. art. 6, para. 2; *Antoine v. Washington,* 420 U.S. 194, 204, 43 L. Ed. 2d 129, 95 S. Ct. 944 (1975). Congress, alone, has the power to abrogate a treaty or to impose additional limitations on Indian treaty rights. U.S. Const. art. 1, § 8; *Antoine v. Washington, supra* at 203. The Supreme Court has construed treaty rights broadly, in favor of Indians, and has protected them from encroachment by state govern-

ment. *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 406 n.2, 20 L. Ed. 2d 697, 88 S. Ct. 1705 (1968); *Choate v. Trapp,* 224 U.S. 665, 675, 56 L. Ed. 941, 32 S. Ct. 565 (1912); *United States v. Winans,* 198 U.S. 371, 380–81, 49 L. Ed. 1089, 25 S. Ct. 662 (1905). Any other construction, it has stated, would result in "an impotent outcome to negotiations and a convention, which seemed to promise more and give the word of the Nation for more." *United States v. Winans, supra* at 380.

Yet the Court has also recognized the state's power to regulate game within its boundaries. *Baldwin v. Fish & Game Comm'n,* 436 U.S. 371, 391, 56 L. Ed. 2d 354, 98 S. Ct. 1852 (1978). This state regulatory power may be applied, in most cases, whenever the regulation is rationally related to some legitimate state objective. Yet it may only be applied to limit "rights" guaranteed to Indians by the federal government if it is nondiscriminatory and meets appropriate standards for game conservation. *Puyallup* I, 391 U.S. at 398.

In order to determine whether the regulations in this case are valid as applied to petitioners, we must first determine whether the same standards for determining the validity of regulations limiting treaty Indians' "right" to fish applies to their "privilege" to hunt. This question was first raised in Washington courts in *State v. Byrd, supra.* There the court stated, in dicta, that

the treaty by its own terms reserves in the Skokomish Indians less than an absolute right to hunt. While the treaty provides that the Indians have the *right* to fish at their usual and accustomed grounds, it provides that they have only the *privilege* to hunt on open and unclaimed lands. This difference in language has been recognized as more than a semantic distinction. *See United States v. Washington,* 384 F. Supp. 312, 336 (W.D. Wash. 1974), *vacated on other grounds,* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979). *See generally New York ex rel. Kennedy v. Becker,* [241 U.S. 556, 60 L. Ed. 1166, 36 S. Ct. 705 (1916)].

*Byrd,* at 343.

█ Whatever the legal distinction between "right" and "privilege" might be in some contexts, there is no persuasive authority to distinguish between these terms when interpreting treaties between Indians and the federal government. In fact, the *Byrd* court's implication that a treaty "privilege" somehow reserves less to the Indians than a treaty "right" is in direct conflict with the canons of construction applicable to Indian treaties.

Treaty language must "be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.'" *Fishing Vessel Ass'n,* at 676, quoting *Jones v. Meehan,* 175 U.S. 1, 11, 44 L. Ed. 49, 20 S. Ct. 1 (1899). In addition, treaties must be construed broadly in the Indians' favor. While lawyers might attach a different meaning to the words "right" and "privilege," it is clear from the evidence surrounding the negotiation of these treaties that the Indian parties did not.

> The treaties were written in English, a language unknown to most of the tribal representatives, and translated for the Indians by an interpreter in the service of the United States using Chinook Jargon, which was also unknown to some tribal representatives. Having only about three hundred words in its vocabulary, the Jargon was capable of conveying only rudimentary concepts, but not the sophisticated or implied meaning of treaty provisions about which highly learned jurists and scholars differ.

*United States v. Washington, supra* at 330. Consistency with canons of construction mandates that we construe the "privilege" to hunt as equivalent to the "right" to fish, for "'[t]he language used in treaties with the Indians should never be construed to their prejudice.'" *Jones v. Meehan, supra* at 11.

The *Byrd* court's reliance upon *New York ex rel. Kennedy v. Becker,* 241 U.S. 556, 60 L. Ed. 1166, 36 S. Ct. 705 (1916) does not persuade us to the contrary. In *Becker,* the land in question was transferred by treaty from the Seneca Tribe to a private party who in turn transferred it to

another private party. It was in this narrow context that the court held the Seneca Tribe had reserved only the "privilege" to hunt and fish and was, therefore, subject to reasonable state regulation. *Accord, United States v. Washington, supra* at 336–37. One scholar has further distinguished *Becker* on the basis that the United States did not participate in negotiating the agreement, but merely used its treaty power to validate the land transfer pursuant to the Indian Nonintercourse Act of 1976. Because Congress did not manifest an intent to invoke the power and protection of the federal government to effect the treaty terms, the supremacy clause did not preclude reasonable state regulation. *Felix S. Cohen's Handbook of Federal Indian Law* 459 (1982).

Our conclusion that the "privilege" to hunt is equivalent to the "right" to fish finds further support in its treatment by three other courts which have considered treaty Indians' hunting rights under identical treaty language. In *State v. Arthur*, 74 Idaho 251, 261 P.2d 135 (1953), a member of the Nez Perce Tribe was convicted for killing a deer out of season within National Forest lands in violation of state law. Defendant had been hunting on traditional Nez Perce hunting grounds and contended that his right to do so, without regard to state regulation, had been secured by federal treaty. At issue was the treaty between the United States and Nez Perce Indians which guaranteed both the "right of taking fish" and the "privilege of hunting." The Idaho Supreme Court made no distinction between the treaty "right" and "privilege," but based its construction of the treaty on the understanding of the parties at the time.[3]

---

[3] The *Arthur* court was persuaded in its conclusion by the following assurance given by Governor Stevens to the Nez Perce:

> "You will be allowed to pasture your animals on land not claimed or occupied by settlers, white men. * * * You will be allowed to go to the usual *fishing places and fish in common with the whites, and to get* roots and berries and to kill game on land not occupied by the whites; all this outside the Reservation."

*State v. Arthur*, 74 Idaho 251, 261, 261 P.2d 135 (1953).

It then held that the treaty had reserved in the Nez Perce the unqualified right to hunt on land ceded by them to the United States, so long as the lands had not been claimed by non–Indian settlers.

In *State v. Stasso, supra,* the Montana Supreme Court considered a similar case under the Treaty of Hell Gate which contained identical treaty language. The Montana court held in accordance with *Arthur.* Similarly, in *Holcomb v. Confederated Tribes,* 382 F.2d 1013 (9th Cir. 1967), the Ninth Circuit Court of Appeals considered an action, brought by signatory tribes to the Treaty of June 9, 1855, for declaratory and injunctive relief against the Oregon State Police Department. The treaty language considered was, again, identical to the language before us here. The trial court had found that the signatory tribes had a treaty "right, privilege and immunity . . . to hunt for subsistence purposes on 'unclaimed lands' without restriction or control under the game laws and regulations of the State of Oregon . . ." *Holcomb,* at 1013–14. The Court of Appeals affirmed and held that state regulation of Indian treaty hunting and fishing rights must be "indispensable" to conservation. The trial court had found that application of Oregon's game regulations to Indians was not necessary to conservation.

On the basis of the history of this treaty language, the canons of construction applicable to treaties and the above authority, we find that the federal government promised to protect Indian fishing and hunting rights on an equal basis. For treaty purposes, there is no operative distinction between the terms "right" and "privilege."[4]

The next issue is whether the trial court applied the correct standard of review when it determined the game regulations were valid as applied to petitioners. The court relied

---

[4]Petitioners did not here assert, nor was the record adequate to establish, a historical basis for concluding that the treaty hunting right at issue here extends beyond subsistence or ceremonial purposes as it does with the treaty fishing right. We leave this issue to another and, hopefully, clearer day.

upon *State v. Byrd, supra,* which held that the State Department of Game could regulate treaty Indian hunting so long as its regulations were "reasonably necessary" to conservation and not discriminatory. The *Byrd* court put the burden of challenging the regulations on defendants.

Subsequent to the decisions in *Arthur* and *Holcomb,* the Supreme Court clarified the decision of *Tulee v. Washington,* 315 U.S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942), in which it had first suggested that a state might validly apply necessary conservation measures to Indians. *Tulee,* at 684. In *Puyallup* I, the Court held the state's police power would permit it to regulate Indian fishing rights under this treaty provision so long as it did so in the interest of conservation and so long as "the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup* I, 391 U.S. at 398.

In *Antoine v. Washington, supra,* the Court considered Indian hunting rights under a contract with the United States which had been subsequently ratified by Congress. The contract terms guaranteed that the Indians' "right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged.'" *Antoine,* at 197 n.4. To determine the extent of the state's ability to regulate Indian hunting, consistent with the terms of this contract, the Court turned to its decision in *Puyallup* I.

> The "appropriate standards" requirement means that the State must demonstrate that its regulation is a *reasonable and necessary* conservation measure, *Washington Game Dept.* v. *Puyallup Tribe,* 414 U. S. 44 (1973); *Tulee* v. *Washington,* 315 U. S. 681, 684 (1942), *and* that its application to the Indians is necessary in the interest of conservation.

(First italics ours.) *Antoine,* at 207. The Court in *Antoine* was not called upon to define further the standard set forth, because the State had neither argued nor presented evidence demonstrating that the regulations at issue were either reasonable or necessary to conservation.

In *Puyallup* II, the Court gave further meaning to the word "conservation" when it indicated that the state's ability to regulate was based upon the need to preserve a species from extinction.

> We do not imply that these fishing rights persist down to the very last steelhead in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.

*Puyallup* II, 414 U.S. at 49. *See also Sohappy v. Smith,* 302 F. Supp. 899, 908 (D. Or. 1969) (a state may regulate Indian treaty fishing "only to the extent necessary to prevent the exercise of that right in a manner that will imperil the continued existence of the fish resource.").

In *United States v. Washington, supra,* the court applied the *Puyallup* II definition and stated,

> "conservation" as used in Supreme Court decisions and herein is limited to those measures which are reasonable and necessary to the perpetuation of a particular run or species of fish. . . . "reasonable" means that a specifically identified conservation measure is appropriate to its purpose; and "necessary" means that such purpose in addition to being reasonable must be essential to conservation.

384 F. Supp. at 342; *see also Felix S. Cohen's Handbook of Federal Indian Law* 461 (1982).

Several things are clear from these cases: (1) the regulations at issue must be both reasonable and necessary for conservation; (2) the regulations' application to Indians covered by the treaty must be necessary to conservation; and (3) the state has the affirmative burden of proving these elements at the time it first becomes aware that the defendant is an Indian whose tribe was a party to a treaty, or contract subsequently ratified by Congress, which protects his right to hunt in the subject area. A "necessary"

regulation, within this context, is a regulation required for the perpetuation of a species of game within a certain zone. A regulation is reasonable if it is appropriate to its conservation purpose.[5]

Here the trial court relied on the erroneous standard set forth in *State v. Byrd, supra,* and found merely that the Department's regulations were "reasonably necessary" to conservation and nondiscriminatory in effect. This standard is insufficient under the test set forth above.[6] Consequently, *State v. Byrd, supra,* is overruled.

As the State has failed to meet its burden of proof, the judgment is reversed.[7]

WILLIAMS, C.J., and BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., concur.

ROSELLINI, J. (dissenting)—The majority, without analysis, asserts that the State has failed to meet its burden of proving the challenged regulation was a reasonable and necessary conservation measure. I disagree. Having reviewed the trial transcript, I believe the evidence offered by the State is sufficient to meet this test. For this reason, I dissent.

The State produced several witnesses whose testimony contradicts the majority's conclusion that the regulation in question was not a reasonable and necessary conservation

---

[5]We do not read *Antoine* as giving Indians the exclusive right to hunt, but rather as ensuring that their right to hunt is not impaired for purposes other than those of conservation. *See Washington v. Washington State Comm'l Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055, *modified on other grounds sub nom. Washington v. United States,* 444 U.S. 816, 62 L. Ed. 2d 24, 100 S. Ct. 34 (1979).

[6]Since the expert testimony at trial related to the need for regulations which took effect after the incident under consideration, the court need not reach the question of whether those regulations are "reasonable and necessary for conservation."

[7]Because we have resolved this case on the treaty issue, we do not reach the free exercise issue.

measure. For example, Agent Roberts' testimony established that, without a closed season, a serious threat to the population of the elk herd would exist. In addition, the State presented the testimony of a biologist, Max Zahn, concerning the importance of a large number of female elk to conservation. His testimony also established that the population trend in the Skokomish unit had dropped sharply in 1968 and 1969, had begun to build up in 1974 and 1975 and then declined. He concluded the current trend for the herd was downward. He noted that this decline had resulted in the State banning the killing of cow elk for the 2 previous years.

This testimony substantiates the State's claim that the regulation in question was a reasonable and necessary conservation measure. The State having met its burden that the regulation is valid is thus entitled to enforce that regulation. I would thus affirm the defendant's convictions.

Reconsideration denied December 12, 1984.