708 P.2d 853

**STATE of Idaho, Plaintiff-Respondent, Cross-Appellant,**

v.

**Curtis CUTLER, Cecil Breland, Lonnie Hutchinson, Thomas Hughes, Samuel Lester Galloway and Larry Dean Teton, Defendants-Appellants, Cross-Respondents.**

No. 14699.

Supreme Court of Idaho.

March 19, 1985.

Second Rehearing Denied Aug. 30, 1985.

John D. Ross, III, Fort Hall, for defendants-appellants, cross-respondents.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Stephen V. Goddard, Deputy Atty. Gen., Boise, for plaintiff-respondent, cross-appellant.

## ON DENIAL OF PETITION FOR REHEARING

BAKES, Justice.

Appellants, enrolled members of the Shoshone-Bannock Indian Tribe residing on the Fort Hall Reservation, appeal from a district court decision affirming a judgment of conviction entered by the magistrate court for misdemeanor game violations. Appellants assign as error the magistrate court's denial of a motion to dismiss charges against them for violations of I.C. § 36-502(b), the possession of unlawfully taken or killed wildlife. The defendants admit the facts alleged by the state but urge as their sole defense the off-reservation hunting rights reserved by the Indians in the 1868 treaty at Fort Bridger between the Shoshone-Bannock Tribes and the United States Government. The magistrate court held that the hunting rights do not extend to the state-owned property on which the wildlife was killed, a wildlife management area known as the Sand Creek Ranch, and subsequently found the defendants guilty. The district court affirmed on appeal. We also affirm.

On November 10, 1978, officers of the Idaho Fish & Game Department patrolling on Sand Creek Ranch came upon four of the defendants with a pickup truck about 75 yards off the road. There were two elk in the back of the pickup and one elk on the ground. The defendants admitted killing the elk and were cited for being in possession of unlawfully taken wildlife. The defendants presented their Shoshone-Bannock Tribe enrollment cards, claiming treaty rights to hunt on the property. The officers located the kill sites which were on the Sand Creek Ranch property.

The other two defendants were given citations for possessing unlawfully killed wildlife on December 2, 1978. The officer observed a pickup and horse trailer on the Sand Creek Ranch property, and later two other defendants, who were approaching on horseback in the snow, were stopped and questioned. The defendants admitted to killing an elk and deer within the Sand Creek Ranch. The snow trails left by dragging the dead animals were followed back to the kill sites which were on property owned by the State of Idaho within the Sand Creek Ranch.

The misdemeanor charges were brought in the magistrate court of Fremont County. The defendants filed a motion to dismiss based on the Fort Bridger Treaty of 1868. That treaty which established the Fort Hall Indian Reservation states:

"Article 4. The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said

reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the hunting districts." Numerous affidavits and documentary exhibits were submitted in support of the motion to dismiss. After considering all of the affidavits, exhibits and legal memoranda submitted by both parties, the magistrate thoroughly considered the treaty claim in a written memorandum which concluded that the place where the game animals were killed was not "unoccupied lands of the United States" within the meaning of the treaty, and the motion to dismiss was denied.

At the time of trial which was set for December 16, 1980, the defendants, after waiving a jury, filed a stipulation of facts signed by each of the defendants. The two-sentence stipulation first admitted that the defendants "did hunt upon state owned lands within the Sand Creek ranch portion of the Sand Creek Wild Life Management Area at the dates and times charged, and that they did possess elk and deer, as charged, upon such state owned lands dur-

ing the state's closed season." In the second sentence the defendants "further renew their motion to dismiss the charges filed herein based upon the 1868 Treaty of Fort Bridger, as well as the affidavits, exhibits and legal memoranda previously submitted herein, and defendants continue to maintain that their hunting activities are immunized as a matter of law from any state prosecution by virtue of the 1868 treaty." The state agreed to the stipulation, according to the recitals in the judgment of conviction, although there is nothing filed in the record on appeal to confirm this. Based upon the defendants' stipulation, the magistrate found the facts alleged in the criminal complaints to be true, judged each defendant guilty and, relying upon his previous order dated November 7, 1980, denied the motion to dismiss.[1]

The consolidated cases were appealed to the district court which denied a trial *de novo* and affirmed the judgments of conviction. In the present appeal the appellants have assigned no procedural error and assert only their treaty rights, claiming immunity from prosecution through the supremacy clause, U.S. Const. art. VI, cl. 2. The issue presented is whether the hunting rights reserved in the treaty extend to the property on which the animals were shot,

1. Although the only written stipulation of facts in the record is the two-sentence stipulation signed by each of the defendants in this matter, it is apparent from a review of the entire record that the trial court considered all of the affidavits, exhibits and memoranda submitted by the parties as being part of the stipulated record upon which the trial court based its decision. In its lengthy opinion denying the motion to dismiss, dated November 7, 1980, a month before trial, which the trial court incorporated into the judgment of conviction entered December 17, 1980, the court recites facts and argument from all of the documentary material furnished by both sides. In its brief in support of an earlier motion to dismiss, the appellants had argued that "in making these legal determinations, the court is empowered to examine relevant historical and contemporary facts as well as the opinions of qualified experts" via affidavits and exhibits. Although the various affidavits, exhibits, and memoranda have filing stamps on them indicating that they were filed at various times throughout these proceedings, none of the documentary evidence has any

markings indicating that they were marked for identification, offered or admitted into evidence. The trial minutes also do not reflect any offers or admittances into evidence of any documents.

At the end of the clerk's transcript filed in the Supreme Court is a certificate dated October 28, 1982, made nearly two years after trial, in which a deputy clerk certifies "that the foregoing exhibits were marked for identification and offered in evidence, admitted and used and considered by the court in its determination at a hearing on December 16, 1980." (Emphasis added.) However, in the subsequent list of exhibits, some are listed as "admitted," some as "marked for identification," and some as "offered." While one might view the clerk's certificate of exhibits on appeal as internally inconsistent, it is apparent that the magistrate's November 7, 1980, opinion denying the motion to dismiss, and the December 17, 1980, judgment of conviction incorporating the November 7, 1980, opinion were based upon all of the documentary evidence submitted by both parties.

which is operated by the Idaho Fish & Game Department as a wintering range for elk and deer.

We have found no cases which have considered the question of whether state lands constitute "unoccupied lands of the United States" in relation to the off-reservation Indian hunting rights. In *State v. Tinno*, 94 Idaho 759, 497 P.2d 1386 (1972), it was uncontested, and the Court agreed with all parties, that the Challis National Forest owned by the federal government was "unoccupied lands of the United States." A similar phrase of "open and unclaimed land" under the Nez Perce Treaty of 1855 was held to include the national forest lands. *State v. Arthur*, 74 Idaho 251, 261 P.2d 135, *cert. den.* 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087 (1953). Other cases have come to the same conclusion. *See Confederated Tribes of the Umatilla Indian Reservation v. Maison*, 262 F.Supp 871 (D.Or.1966), *aff'd sub nom Holcomb v. Confederated Tribes*, 382 F.2d 1013 (9th Cir.1967); *State v. Stasso*, 172 Mont. 242, 563 P.2d 562 (1977). The question of whether privately owned lands would be subject to the off-reservation Indian hunting rights retained in the 1868 Fort Bridger Treaty has never been litigated to our knowledge. However, in *State v. Coffee*, 97 Idaho 905, 556 P.2d 1185 (1976), we held that privately owned land outside an Indian reservation is not "open and unclaimed land" within the meaning of the hunting rights clause in the 1855 treaty of Hellgate. The Washington Supreme Court has also reached a similar result in construing the "open and unclaimed land" language of the 1855 Yakima Treaty. *State v. Chambers*, 81 Wash.2d 929, 506 P.2d 311 (1973). Other cases have considered treaty hunting rights relating to privately owned lands in different contexts. *See United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) (Indians allowed right of access over private lands in order to exercise fishing rights); *Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975) (northern half of Colville Indian Reservation ceded to United States with Indians reserving absolute

hunting rights); *Kimball v. Callahan*, 590 F.2d 768 (9th Cir.1979), *cert. den.* 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979)(Kalmath Indian hunting rights retained when reservation terminated extends to both public and private lands on former reservation). While it may be more likely that state or federally owned land is unsettled, unclaimed or unoccupied, the state or federal government is not necessarily foreclosed from using specific tracts of lands in such a manner that the signatory Indians to treaties would have understood the lands to be claimed, settled or occupied to the exclusion of their off-reservation hunting rights reserved under particular treaties. This rationale is consistent with a recent United States District Court for the Western District of Washington opinion in which it held that the treaty of Olympia with the Quinault Indians which reserved hunting rights on "open and unclaimed lands" did not extend to the Olympic National Park owned by the federal government. *United States v. Hicks*, 587 F.Supp. 1162 (W.D. Wash.1984). That court concluded that hunting was not a use compatible with the national park since the federal government prohibited all hunting within the park. However, none of the foregoing precedents are dispositive of the present case.

In resolving this issue we acknowledge that the interpretation of the Fort Bridger Treaty is a federal question and that the final arbiter of its meaning is the United States Supreme Court. In a prior opinion addressing the extent of the Shoshone-Bannock tribe's timber and mineral rights to their reservation lands reserved under the Fort Bridger Treaty, the United States Supreme Court stated:

"The phrase 'absolute and undisturbed use and occupation' is to be read, with other parts of the document, having regard to the purpose of the arrangement made, the relation between the parties, and the settled policy of the United States fairly to deal with Indian tribes. In treaties made with them the United States seeks no advantage for itself; friendly and dependent Indians are likely

to accept without discriminating scrutiny the terms proposed. They are not to be interpreted narrowly, as sometimes may be writings expressed in words of art employed by conveyancers, but are to be construed in the sense in which naturally the Indians would understand them." *United States v. Shoshone Tribe of Indians*, 304 U.S. 111, 116, 58 S.Ct. 794, 797, 82 L.Ed. 1213 (1938). We acknowledged this standard of construction in *State v. Tinno*, 94 Idaho 759, 497 P.2d 1386 (1972), which held that the "right to hunt on unoccupied lands of the United States," which was reserved in Article 4 of the Fort Bridger Treaty, included the "right to fish" on the national forest lands. In *Tinno* we stated, "Courts must interpret these treaties differently than ordinary conveyances (citations omitted), keeping in mind the probable understanding of the Indians (citation omitted)." 94 Idaho at 763. 497 P.2d at 1390.

The present dispute centers on the meaning of the words "unoccupied lands of the United States" as used in Article 4 of the treaty. The phrase at issue must be read consistently "with other parts of the document having regard to the purpose of the arrangement made," *United States v. Shoshone Tribe of Indians*, 304 U.S. at 116, 58 S.Ct. at 797. Article 2 of the treaty describes a tract of land in the millions of acres to be set aside for the *"occupation* of the Shoshonee Indians" (emphasis added), estimated from the evidence to be merely 1,500 individuals in 1867. Under the treaty a relatively few Indians were to "occupy" millions of acres of land within the meaning of the treaty, which suggests that the signatory Indians' understanding would not necessarily require actual physical presence or use to change land from an "unoccupied" to an occupied status. The extrinsic evidence reveals that the tribal leaders had visited federal military outposts and settlements in the northwest, including Fort Bridger, Fort Laramie, and Salt Lake City, and from those settlements undoubtedly understood that a governmental unit could "occupy" lands within the meaning of the treaty. Therefore, the

mere fact that the State of Idaho owns the ranch and no one physically resides on the property year round does not necessarily mean that Sand Creek Ranch is "unoccupied lands."

In reference to the phrase "lands of the United States," the magistrate court held this issue need not be decided, but the district court on appeal seemed to imply that unless the lands were owned by the federal government the lands could not be subject to the treaty hunting rights. There is nothing in the treaty or extrinsic evidence which would indicate that the signatory Indians had an understanding of the difference between the state and federal governments. It was their probable understanding that the "white man's" government was all one unit since there were no state governments within the area in 1868. Therefore, the mere fact that the state owns and controls the Sand Creek Ranch, as opposed to the federal government, does not necessarily mean that the ranch falls outside the meaning of the phrase "lands of the United States."

Since the foregoing conclusions do not dispose of this case, we must now look to the specific facts of the case to determine whether the Sand Creek Ranch is subject to the off-reservation treaty hunting rights. On July 3, 1868, the Indian leaders and the United States government officials met at Fort Bridger to negotiate the treaty. At this meeting General Auger of the United States government explained the treaty to the Indian chiefs. His explanation included the following statements:

"There are a great many white men in your country now, and as soon as the railroad is completed there will be many more. They will wish to remain and make their homes here, and your great father desires that they should do so, and he will make the same arrangements for acquiring such title as you have to this country as the commission has heretofore made with other Indian tribes. He wishes, however, to set apart a portion of it for your permanent homes, and into

which no white man will be permitted to come or settle. Upon this reservation he wishes you to go with all your people as soon as possible, and to make it your permanent home, but with permission to hunt wherever you can find game. In a few years the game will become scarce, and you will not find sufficient to support your people. You will then have to live in some other way than by hunting and fishing. He wishes you therefore to go to this reservation now, and commence to grow wheat and corn, and raise cattle and horses, so that when the game is gone you will be prepared to live independently of it."

Chief Washakie of the Shoshones gave a response which demonstrated his approval of the treaty. He indicated that he understood the railroad and many more white men were coming. His only comment relevant to the reserved hunting rights term was "[I] want the privilege of going over the mountains to hunt where I please." The historian Grace Raymond Hebard has stated the following conclusion about the understanding of Chief Washakie concerning hunting:

"Though born and reared a nomad and doubtless a passionate lover of the free life of the wild, he had the wisdom to see that the old days were doomed; that with the oncoming of the whites, game would disappear and that his people would be compelled to make their living by more settled modes of labor than the chase. He was doubtless the first among them to favor schools and other facilities for learning the white man's ways of life. Peacefully and without noted incident he brought his reluctant people into the new era." *Washakie*, Hebard, p. 23 (1930).

Chief Taghee of the Bannocks did not respond substantively to General Auger's explanation on July 3, 1868. However, during negotiations on a previous unratified treaty in Soda Springs, Idaho, in 1867, Chief Taghee stated:

"I am willing to go upon a reservation, but I want the privilege of hunting the buffalo for few years. When they are all gone far away we hunt no more; perhaps one year, perhaps two or three years; then we stay on the reservation all the time." [2] *The Bannock of Idaho*, Madsen, p. 160 (1958).

It is apparent from the record that the signatory Indians understood that their off-reservation hunting rights reserved in the treaty were not absolute and would diminish with the increased occupation of the lands and the decrease in available game.

Now we focus on the specific facts surrounding the Sand Creek Ranch. The bulk of the land comprising the Sand Creek Ranch was conveyed to many private individuals through separate United States patents from 1904 to 1934. The record does not disclose what use each of these individuals made of the property. By 1944, all the land was consolidated into ownership of Edgar Chapman who raised grain and hay for the benefit of his cattle operation on the property. Chapman maintained fences, outbuildings and a residence on the ranch. Herds of elk which migrated to the area for the winters conflicted with Chapman's cattle operation. Since Chapman could not keep the elk from eating the cattle's winter feed and overgrazing the pastures, he applied for, but was refused, special permits to shoot elk in order to drive them from the area. He also demanded payment for his losses to the wintering elk. It became apparent to the Fish & Game Department that the only way to preserve the elk herds was to purchase the property. The purchase was completed with partial federal funding and the property has since been maintained by the Fish & Game Department for the benefit of the wintering elk, deer and moose.[3]

---

**2.** Defendants argue that this quote is irrelevant to construing the Fort Bridger Treaty. We disagree. It is relevant in that it is historical circumstantial evidence of Chief Taghee's understanding of reserved hunting rights under a proposed treaty closely related both in time and purpose to the Fort Bridger Treaty.

**3.** In 1951, 1000 acres of federal land which was interspersed throughout the ranch were removed from the federal public land laws, and

Sand Creek Ranch is completely enclosed with fences, some of which are a "letdown" type which are lowered prior to winter and raised in the spring in order not to obstruct the natural routes of elk migrating to and from their summer grounds. The department has continued to raise grain on the ranch and has increased the number of buildings, although none is used as a year round residence. Water projects have been constructed on the ranch for the benefit of the wildlife. The grasses on the grazing areas are monitored, encouraged and protected from noxious weeds, all for the benefit of the wildlife, primarily elk, feeding through the winter. All entrances to the ranch are posted with signs designating the ranch as an "Idaho Fish & Game Wildlife Management Area."

There seems to be no question that prior to the state's purchase in 1947, when the Sand Creek Ranch was owned either by the Chapmans or their numerous predecessors, these lands were not "unoccupied lands of the United States" within the meaning of the treaty. *Cf. State v. Coffee*, 97 Idaho 905, 914, 556 P.2d 1185, 1194 (1976) ("land which is privately owned is not open and unclaimed"). Through the indicia of occupancy, *i.e.*, cattle, fences, cultivated fields, and buildings, the signatory Indians would have understood these lands to be occupied by the private settlers to the exclusion of their hunting rights. The mere fact that this ranch was transferred to state ownership should not change its classification under the treaty. The state continued to operate the ranch in a manner paralleling the operation of a cattle ranch. While one indicium of occupancy, the cattle, was removed after title was transferred, other indicia of occupancy were added, such as continuous fences, signs, buildings, machinery, water projects, cattle guards, roads and campgrounds. While we do not base our opinion solely on the presence of indicia of occupancy, nevertheless the indicia of occupancy are strong in this case. Each case must be evaluated on its peculiar facts

to determine whether the off-reservation hunting rights reserved in the 1868 Fort Bridger Treaty extend to the specific lands.

█ From the above analysis we affirm the trial court's conclusion that the game violations in this case did not occur on "unoccupied lands of the United States" within the meaning of the 1868 Fort Bridger Treaty. This holding is based on a combination of the following factors: (1) the Indians understood that lands could be occupied without actual physical presence or use, and that such occupancy could be by a governmental entity; (2) they also understood their off-reservation hunting rights would diminish with time; (3) the Sand Creek Ranch was acquired from a private party who operated it as a cattle ranch which clearly was not subject to the hunting rights; (4) the state continued to operate the ranch without a significant change, but merely changed the benefitting livestock from cattle to elk.

█ The appellants argue that the state itself allows hunting within the Sand Creek Ranch, implying that the Indians' hunting rights are not incompatible with whatever use the state is making of the ranch. The evidence shows that a controlled elk hunt from September 27 to October 8, 1978, issued 75 permits for all of Unit 60 which includes the Sand Creek Ranch. The department also allowed a five day general hunt in Unit 60 for deer and antlered elk from October 11 to October 15, 1978. This argument becomes less compelling, however, when one realizes that during the days of the regular hunting seasons there were very few, if any, elk and deer on the Sand Creek Ranch. The "project statement" and "policy plan" of the Idaho Department of Fish & Game indicated that grain fields are located so as not to attract the herds "onto the winter range too early" in order to preserve the wintering range feed. The herds do not migrate to or gather in the Sand Creek area until "late fall"

the Idaho Fish & Game Department was granted exclusive use of the 1000 acres as an "elk refuge." Public Order 742, U.S. Dept. of Interior

(1951). The game violations in the present case occurred on state-owned, not federally-owned ground.

or "early winter." The herds spend their summers and early falls in other areas of Unit 60 which includes thousands of acres of unoccupied national forest lands. The state's limited consent to allow hunting on the Sand Creek Ranch during limited times parallels the right of a private owner to grant or withhold consent for any hunting on privately owned land. Once a party has "occupied" the lands, it would seem that the owner, whether it is the government or a private party, could grant a limited right to hunt on the lands without waiving its right to withhold consent at times when hunting is inconsistent with its use of the lands. The act of killing elk during the winter would seem to be the ultimate inconsistent act with the state's use of the Sand Creek Ranch in preserving and protecting the wintering elk herds. *Cf. United States v. Hicks,* 587 F.Supp. 1162 (W.D.Wash. 1984).

■ The defendants argue that because the Sand Creek Ranch purchase and maintenance has been partially funded by the federal government, and because the federal government must approve any disposition of the lands, the Sand Creek Ranch is under the ultimate supervision and control of the federal government and is indistinguishable from the national forest lands. Our determination is based on whether this land is occupied, not on a distinction between federal and state owned land. However, we can find no authority and the record contains no evidence for the proposition that the federal government could not "occupy" lands to the exclusion of the off-reservation hunting rights retained in the 1868 Fort Bridger Treaty. The *Hicks* case previously cited suggests otherwise.

The state has cross appealed from the magistrate court's refusal to strike portions of a certain affidavit. The affidavit, submitted by defendants, was the expert testimony of an anthropologist familiar with the history of the Shoshone and Bannock Tribes. The state claimed he was unqualified to render an opinion concerning the Fort Bridger Treaty. Our disposition

of this case makes it unnecessary to rule on the state's cross appeal.

Affirmed.

DONALDSON, C.J., and SHEPARD, J., concur.

BISTLINE and HUNTLEY, JJ., dissenting.

Today we who do not join the Court's opinion unite with others as witnesses to a travesty in Indian jurisprudence and the continued tragic and abysmal disregard for Indian rights by a court of law. Embedded canons of Indian law interpretation and application have been turned on their head in a majority opinion which grossly misapplies and ignores controlling United States Supreme Court precedent; by a process of legalistic gymnastics the meaning of words and phrases have been twisted and tortured to extinguish century-old rights enjoyed by Indians of this State.

Not only is the decision of the Court flagrantly wrong, but its method of analysis in reaching its conclusion is patently in error. Rather than simply point to the errors in the majority opinion, we will write an opinion predicated on precedent, indicating how this case should have been decided.

The central issue here focuses around interpretation of the 1868 Fort Bridger Treaty entered into by the United States and the Eastern Shoshone and Bannock Indians. Article 4 of the Treaty is the language at issue in this case. It reads:

[The Indians] shall have the right to hunt on the unoccupied lands of the United States so long as game may be found thereon, and so long as peace subsists among the whites and the Indians on the borders of the hunting districts.

For our consideration is whether the words "unoccupied lands of the United States" include the forested lands of Idaho's Sand Creek Ranch, a segment of the state-operated Sand Creek Wildlife Management area. An application of the rules of interpretation for Indian treaties set down by the Supreme Court of the United States to the circumstances surrounding the signing

of the Fort Bridger Treaty—its purpose, intent and impact—compels the holding that the land in question is included within the Treaty's language.

## HISTORY

The appellants are six enrolled members of the Shoshone-Bannock Tribes, each of whom lives on the Fort Hall Indian Reservation in southeastern Idaho. They were convicted of the misdemeanor offense of illegal possession of wildlife for killing one deer and four elk on state-owned lands of the Sand Creek Ranch after the close of the State's regulated hunting season. The Indians assert that the convictions must be overturned under Article 4 of the 1868 Fort Bridger Treaty, for it allows them to hunt on "unoccupied lands of the United States" without regard to state-fixed hunting seasons. The State contends that the convictions were proper because the title to the land upon which the hunting took place is in the State of Idaho, not the United States, and because, it argues, the land was in fact occupied. Those are the questions to be answered, but answered only in light of the Treaty.

Sand Creek Ranch is one segment of the 27,000 acre Sand Creek Wildlife Management area located in Fremont County. The ranch is comprised of 1,000 acres owned by the United States interspersed among 4,760 acres owned by the State of Idaho. The entire wildlife area is operated as a wildlife restoration project by the Idaho Department of Fish and Game under the authority of two federal statutes: the Federal Aid and Wildlife Restoration Act, 16 U.S.C. §§ 669 et seq., and the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. §§ 661–66c. As with most of the state-owned land within the management area, Sand Creek Ranch was purchased with approximately 75 percent federal funds. Although managed by Idaho's Department of Fish and Game, such lands remain under the ultimate supervision and control of the federal government.

The entire management area is within the aboriginal domain which was used and occupied by the Shoshone-Bannock Tribes prior to the 1868 Treaty. In Article 2 of the 1868 Treaty (15 Stat. 674), the tribes ceded to the United States their aboriginal rights to occupy all lands now within that area. Since the Treaty, the United States has continuously owned all Federal lands in the area. All state-owned lands were originally owned by the United States until title was transferred, after 1890 when Idaho entered the Union, to either the state or to private predecessors who subsequently sold their land to the state.[1]

Trial was held in magistrate court on a record of stipulated facts. The only issue for resolution was the question of whether

---

1. Federal law has mandated the recognition and respect for Indian treaties in Idaho since its organization as a territory. That obligation has never changed. §§ 1 and 17 of the Organic Act of The Territory of Idaho, 12 Stat.L. 808, ch. 117, provided in part:

    § 1. *Provided, further, that nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such right shall remain inextinguished by treaty between the United States and such Indians,* or include any territory, which, by treaty with the Indian tribes, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries and constitute no part of the territory of Idaho, until said tribe shall signify their assent to the President of the United States to be included within the said territory, or to affect the authority of the government of the United States, to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never been passed.

    § 17. *Treaties with Indians—Duty to keep and observe.—All treaties, laws, and other engagements made by the government of the United States with the Indian tribes inhabiting the territory embraced within the provisions of this act, shall be faithfully and rigidly observed,* anything contained in this act to the contrary notwithstanding; and that the existing agencies and superintendencies of said Indians be continued with the same powers and duties which are now prescribed by law, except that the President of the United States may, at his discretion, change the location of the offices of said agencies or superintendencies. (Emphasis added.)

the Indians had a paramount right to hunt on the land in question under the 1868 treaty. The magistrate's ruling that the land was not "unoccupied" under Article 4 was based on two criteria: (1) "the inherent right of an agency of state government to possess, to use and to 'occupy' real property in a physical sense paralleling a private citizen's ownership in and to real property"; and (2) the presence of some outward indicia of occupancy: fencing, signs, improvements to the land, etc. The magistrate deemed it unnecessary to decide whether the state-owned land constituted land "of the United States" under the language of the treaty.

Sitting as an appellate court, the district court affirmed the convictions, but held that necessary to and implicit in the magistrate's decision was a determination that the land was not owned by the United States. The district court thereupon supplied that determination. This appeal ensued.

### I.

In interpreting the Fort Bridger Treaty, it is important to first review pertinent fundamental tenets of Indian law. First, an Indian treaty involves the granting of rights from the Indians to the grantee. It is not a grant of rights to the Indians. *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905); *accord Washington v. Fishing Vessels Ass'n,* 443 U.S. 658, 678, 680–81, 99 S.Ct. 3055, 3070, 3071–72, 61 L.Ed.2d 823 (1979). Thus, all rights not granted by the Indians are reserved to them. These rights are reserved to every individual Indian as though named in the treaty. *Winans,* 198 U.S. at 381, 25 S.Ct. at 664.

Second, a treaty " 'must be construed, not according to the technical meaning of its word to learned lawyers, but in the sense in which they would naturally be understood by the Indians.' " *Washington,* 443 U.S. at 676, 99 S.Ct. at 3069, (quoting *Jones v. Meehan,* 175 U.S. 1, 11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899)). *See also State v. Tinno,* 94 Idaho 759, 763–64, 497

P.2d 1386 (1972). The reason for this is that the United States is presumed to be the party possessing superior negotiating skills and superior knowledge of the language in which the treaty was recorded. F. Cohen, *Handbook of Federal Indian Law* 446 (1982 ed.). Thus, the United States has a special obligation not to take advantage of the other side. *Washington,* 443 U.S. at 676, 99 S.Ct. at 3069.

Third, Indian hunting, fishing and gathering rights are often preserved in treaties. *See, e.g., Washington; Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968); *Winans; Tinno.* The scope of these rights recognized by the courts is "very broad, virtually as broad as the exercise of those rights by the Indians prior to their settlement on reservations. Cohen, *supra,* at 446. Courts construe these rights broadly, for the purpose of preserving the rights was to enable the Indians to utilize the game, fish, and plant resources as a means of assuring self-sufficiency. *Id.*

Finally, reference to facts at the time a treaty was signed is the method used for determining the intent of the parties, particularly the Indians; it is not a means for limiting the Indians' rights. *Id.* at 447. This method is proper and essential in correctly adjudicating the Indians' rights. *See Washington,* 443 U.S. at 664–69, 99 S.Ct. at 3063–66; *Tinno,* 94 Idaho at 762–64, 497 P.2d 1386.

### II.

The first issue to resolve is whether the Sand Creek Ranch is "unoccupied" within the meaning of the Treaty. In *Tinno,* 94 Idaho at 764, 497 P.2d 1386, this Court construed Article 4 to mean that Indians could hunt on land not taken by settlers: "In agreeing to settle on a permanent basis [on reservations] they [the Indians] still were expecting rights to harvest food on the *unsettled lands* as a means of subsistence and as an integral part of their way of

life." (Emphasis added.) Records of the 1868 negotiations and salient historical evidence strongly support the *Tinno* Court's interpretation of the statute.

On July 3, 1868, General L.C. Auger, a member of the Indian Peace Commission, met with the Eastern Band of Shoshone and the Mixed Bands of Indians.[2] He explained the purpose and intent of the United States in negotiating a treaty with the Indians:

> About a year ago, the great council and your great Father in Washington sent out a Commission to have a talk with the Indian tribes in the west, to make peace with such as were hostile, and to arrange with all of them that hereafter, there should be no more war between the white men and the Indians.... The Shoshone and Bannocks are at peace with the whites, and have been for years. All we have to do therefore is to arrange matters, that there may never hereafter be a cause of war between them. There are a great many white men in your country now, and as soon as the Railroad is completed there will be many more. They will wish to remain and make homes here, and your great Father desires that they should do so....
>
> He [U.S. President] wishes, however, to set apart a portion of it [aboriginal domain] for your permanent homes, and into which no white men will be permitted to come or settle. Upon this reservation he wishes you to go with all your people as soon as possible and to make it your permanent home, *but with permission to hunt wherever you can find game.*

Auger Minutes (emphasis added).

In explaining the identical provision of the 1868 Fort Laramie Treaty with the Crow

Indians, 15 Stat. 649, 650, Senator Harlan of Iowa stated that there was:

> a provision permitting these Indians to hunt, so long as they can do so *without interfering with the settlements.* So long as outside lands, outside of the reservation, may not be occupied by settlements, and may be occupied by game, they may hunt to the game.

Cong. Globe, 40th Cong., 3d Sess., p. 1348, col. 3 (Feb. 18, 1869) (emphasis added).

In reports sent to Washington in 1877 by Indian agent James Patten, it was made clear that such was also the understanding of the Indians:

> The Shoshone also understand that with the treaty of 1868 permission was given to them to hunt as long as game may be found thereon and that the *same does not interfere with white settlers.*

G. Hebard, *Washakie, An Account of Indian Resistance of the Covered Wagon and Union Pacific Railroad Invasions of Their Territory,* 167 (1930) (emphasis added).

It is clear from the foregoing evidence that both the United States and, more importantly, the Tribes to the Treaty understood Article 4 to guarantee the Indians the right to hunt off-reservation so long as they did not interfere with the encroaching white settlements. That is, both parties to the 1868 Fort Bridger Treaty understood "unoccupied" to mean those areas where hunting would not interfere with the white settlers.

It is readily apparent that Article 4 of the Fort Bridger Treaty was an attempt to accommodate the burgeoning white population, with its geographically fixed agrarian lifestyle, to the traditionally nomadic, wide-

---

**2.** A review of the context in which the treaty was executed is illuminating. Justice Butler in *United States v. Shoshone Tribe of Indians,* 304 U.S. 111, 114, 58 S.Ct. 794, 82 L.Ed. 1213 (1938), discussed the status of the Indians who were party to the 1868 Fort Bridger Treaty: "When the treaty of 1868 was made, the tribe consisted of full-blood blanket Indians, unable to read, write, or speak English. This assessment is borne out by the fact that the treaty negotiations

were conducted through a government interpreter and by the fact that all of the Indian signatories subscribed the treaty with an 'X.'" *See* 15 Stat. at 677. The language barrier was further compounded because some English terminology, when translated to the Indian leaders at the treaty negotiations, would have been understood to encompass more than one meaning. *See Tinno,* 94 Idaho at 767, 497 P.2d 1386.

ranging hunting and gathering lifestyle of the Indians. Traditional Indian ways sadly were incompatible with the white's permanent settlements; however, they were not incompatible with land remaining open and unsettled by farms and towns.

An interesting analogy is the fact that this Court, as well as other courts, has held that national forest lands are "unoccupied lands of the United States" either in interpreting the 1868 Fort Bridger Treaty or other treaties with similar or identical phraseology. *See, e.g., Tinno,* 94 Idaho at 764–66, 497 P.2d at 1390–92; *State v. Arthur,* 74 Idaho 251, 261, 265, 261 P.2d 135, 141, 143 (1953); *Swim v. Bergland,* 696 F.2d 712, 716 (9th Cir.1983); *Confederated Tribes of the Umatilla Indian Reservation v. Maison,* 262 F.Supp. 871, 872 (D.Or. 1966), aff'd sub nom., *Holcomb v. Confederated Tribes,* 382 F.2d 1013 (9th Cir.1967); *State v. Stasso,* 172 Mont. 242, 563 P.2d 562, 563 (1977); *State v. Chambers,* 81 Wash.2d 929, 506 P.2d 311, 312 (1973). We can think of no qualitative factual distinction which makes a state wildlife area materially different from a national forest.

The Fish and Game Department cites several factors for the proposition that lands of the Sand Creek Ranch are distinguishable from the national forest land: let-down snow fences border much of the area, signs identifying the land are posted along the perimeter, a campground (closed for the winter) has been provided, a residence is occupied by Fish and Game Department personnel approximately 25–40 days per year, and earthen dams have been constructed on the Ranch.[3] These factors are not persuasive.

Fencing, government signs, forest service stations, campgrounds, flood control and water conservation projects also exist on national forest land. Moreover, that the State sponsors and promotes hunting by Indians and non-Indians alike in both the state and federal wilderness areas (and even on this ranch in season) compels the

conclusion that such lands are compatible with hunting activities generally. The type of settlement envisioned by the treaty signatories is simply not present. There are no towns, homes, farms, schools or businesses present; the land has not been "settled" in the sense experienced or understood by the Indians in 1868 and provided for by the Treaty. Thus, it is "unoccupied" for purposes of the Fort Bridger Treaty and is appropriate for the exercise of traditional Indian hunting activities.

The reasons the majority relies upon in holding that the land in question is "occupied" are tenuous and illogical. First, it is unreasonable to circumstantially infer that the Indians in 1868 understood Anglo-Saxon concepts of land occupancy solely on the basis of some visits by tribal leaders to white settlements. Such a conclusion, without more corroborative evidence, is grossly ethnocentric, for it fails to take into account the fact that the Indians' concepts of property, possession, and occupancy were different from the white man's. In *Northwestern Bands of Shoshone Indians v. United States,* 324 U.S. 335, 357, 65 S.Ct. 690, 701, 89 L.Ed. 985 (1945), Justice Jackson, in a concurrence, makes just this point:

> We doubt if any interpretor could intelligently translate the contents of a writing that deals with the property concept, for the Indians did not have words to fit ideas that have never occurred to them. Ownership meant no more to them than to roam the land as a great common, and to possess and enjoy it in the same way that they possessed and enjoyed sunlight and the west wind and the feel of spring in the air. Acquisitiveness, which develops a law of real property, is an accomplishment only of the "civilized."

Thus, to suggest that these Indians, in 1868 nomadic and possessing a culture independent of and foreign to the white settler's, would comprehend Anglo-Saxon theories of property on the basis of a few visits

---

3. The specific sites on the Ranch where the game was taken range in distance from approximately two miles to five miles from the resi-

dence, which was not actually occupied at the time in question.

to white settlements requires leaps of faith which we are unable to make.

Second, the fact that the Indians in 1868 conceded that their hunting rights would diminish in time is totally irrelevant to a determination of whether the land in question is unoccupied. The fact is that there is game to be hunted and there is still off-reservation land wherein the Indians can hunt "without interfering with the [white's] settlements." Senator Harlan of Iowa, Cong. Globe 50th Cong. 3d Sess., p. 1348, Col. 3 (Feb. 18, 1869). Furthermore, the reduction in the number of game available for hunting, if such in fact does exist, or the reduction in area considered to be "unoccupied," does not denigrate or diminish the quality or nature of the Indians' hunting rights. So long as there is game to hunt and "unoccupied lands of the United States" upon which to hunt, the Indians' right to hunt is inviolate and must be protected.

Third, the fact that Sand Creek Ranch was acquired from a private party by the State is also totally irrelevant. The fact is that for over forty years the land has been operated by the State under federal government supervision for purposes consistent with the Indians' continued exercise of their treaty rights. Even if the land were still privately owned, that does not in and of itself mean that the land has become "occupied." Granting or denying the Indians' right to hunt based upon a determination of *who* owns the land begs of the type of legal sophistry the United States Supreme Court has long held should be eschewed in interpreting Indian treaties. *See*, part I, *supra*. The method of analysis for deciding whether the land is "unoccupied" should not change simply because of *who* owns title to the land in question.

Property once subject to a treaty does not magically become immune from a treaty simply because it has been acquired by private individuals. In *Winans, supra,* the

Supreme Court held that under an 1859 treaty the Yakima Indians had an easement to go across and use privately-owned land in the exercise of their treaty fishing rights. The Court also held that the Indians' right to fish was "intended to be continuing against the United States *and its grantees.*" *Id.,* 198 U.S. at 381–82, 25 S.Ct. at 664–65 (emphasis added). We do not need to decide if this same reasoning is applicable to the Fort Bridger Treaty, for it is not before the Court. It is also unnecessary in determining whether Sand Creek is "unoccupied" for purposes of the Treaty. *Winans* is mentioned only to point out that determining the ownership of the land is irrelevant in ascertaining whether it is unoccupied as that word was understood by the Indians in 1868.

Fourth, the factors suggested by the State as compelling a holding that the land is "occupied" do not withstand scrutiny. The simple fact is that the Sand Creek Ranch is compatible to hunting activity. No qualitative difference exists between how the Sand Creek Ranch is managed and how national forest lands are managed, which latter lands have consistently been held to be "unoccupied." Neither the State nor the majority opinion have put forth one acceptable reason for differentiating between the land here involved and national forest land. Thus, the reasoning of *Tinno* and other cases holding national forest land to be unoccupied ought to be followed.[4]

In summary, we find ourselves logically compelled by the historical evidence surrounding the negotiation of the 1868 Fort Bridger Treaty, by case law, both federal and state, including Idaho, and by reason, to hold that the land in question is "unoccupied" for purposes of the Treaty.

Assuming *arguendo* that the meaning of Article 4 of the Treaty is unclear, we are still compelled to reach the same result. Chief Justice Marshall long ago stated in *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515,

4. Legal scholars, jurists, and practitioners alike will certainly notice the Court's backing away, knowingly or unknowingly, from its prior decisions in *Tinno, supra,* and *Arthur, supra,* with respect to how it has previously interpreted the term "unoccupied" in the context of Indian treaty interpretation.

519, 582, 8 L.Ed. 483 (1832): "The language used in treaties with the Indians should never be construed to their prejudice." This rule has been reiterated repeatedly since then. *See, e.g., Antoine v. Washington,* 420 U.S. 194, 199, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1979); *Menominee Tribe v. United States,* 391 U.S. 404, 406 n. 2, 88 S.Ct. 1705, 1707 n. 2, 20 L.Ed.2d 697 (1968); *Choate v. Trapp,* 224 U.S. 665, 669, 679, 32 S.Ct. 565, 566, 571, 56 L.Ed. 941 (1912); *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 90, 30 L.Ed.2d 306 (1886); *Kansas Indians,* 5 Wall. 737, 760, 18 L.Ed. 667 (1867). Thus, even under an assumption that the Treaty language is ambiguous, we would also hold that Sand Creek Ranch is "unoccupied."

### III.

The second issue to resolve is whether the lands of the Sand Creek Ranch are "lands of the United States." Two possible theories exist in interpreting this provision: (1) The Treaty covers only property in which title is vested in the federal government; or (2) The Treaty covers all territory within the geographical boundaries of the United States. The district court opted for the first view, but we think it clear that the second view is the one more consistent with the probable understanding of the Indian parties to the Treaty.

It is entirely unlikely that the Indians were even aware of, much less grasped, the concept of the distinction between federal and state ownership of land in 1868. Most of the land within their aboriginal territory would not achieve the status of a state until more than 20 years later. Oregon was then a state, but Montana and Washington would not become states until 1889 and Idaho and Wyoming would not become states until 1890. Utah would not enter the Union until 1896, fully 28 years later. Thus, the aboriginal domain of the

Shoshones and Bannocks in 1868 was almost exclusively within the jurisdiction of federal territories. Further, all of their dealings were with federal representatives who consistently explained that they were negotiating and signing on the authority of the "Great Father" (President) and "Great Council" (Congress) in Washington. *See, e.g.,* Auger Minutes.

The Indians did understand that their permissible hunting area would diminish gradually as whites settled the land; however, the absence of historical proof that their hunting domain would be decreased by any other method compels the conclusion that the Indians understood that such would be the *only* means by which their traditional hunting grounds would be limited. This is particularly true in ruling out the legalistic argument that the lands would be diminished due to title becoming vested in another distinct, politically defined, governmental entity (a change which would create no discernible differences in the nature of the land.) Even if that concept had been explained and somehow understood by the Bannocks and Shoshones, it would require a further leap of faith to believe that they would have understood the fine points involved in federal control of State-owned land, as it exists over the Sand Creek Ranch, and bears on the State's ownership thereof.[5]

We are unable to discover one iota of evidence which would suggest that a mere change in the title of undeveloped forest land, the suitability of which for traditional Indian hunting activities remains unchanged under one non-Indian governmental entity as opposed to another non-Indian governmental entity, was the type of limitation on Article 4 hunting rights contemplated by the parties to the Treaty, particularly by the Indians. In terms of the Indians' understanding of any such change in title, the only relevant point is that the land

---

**5.** The Interior Department has promulgated comprehensive regulations governing projects such as the Ranch and the other two segments of the Management Area. *See* 50 C.F.R., part 80. The Secretary of the Interior must concur in any disposition of the land, and the regula- tions provide for extensive federal supervision of the use and maintenance of the lands. Moreover, if disagreement arises regarding acquisition of land or operation of a project, "[f]inal determination ... rests with the Secretary." *Id.,* at § 80.18.

462

remained within the territorial borders of the United States. The probable understanding of the Indians in 1868 of the intricacies of the separate, co-existent sovereigns of state and federal government, within one geographical area was non-existent and certainly unprovided for in the Treaty. Thus, guided by the probable understanding of the Indians of the Fort Bridger Treaty, and by the rule that doubtful language is to be construed in favor of the Indians, we would hold that the land of the Sand Creek Ranch constitutes "unoccupied lands of the United States" for the purposes of the Treaty.

### IV.

Today's majority decision stands as a monumental setback for Indians not only because the result reached is blatantly wrong, but also because the method of analysis used is wrong. It was Supreme Court Justice Benjamin Cardozo who said: "The loyalty of the Shoshone tribe to the people of the United States has been conspicuous and unfaltering. A fidelity at least as constant and inflexible was owing in return." *Shoshone Tribe of Indians v. United States*, 299 U.S. 476, 486, 57 S.Ct. 244, 246, 81 L.Ed. 360 (1937). Rather than being loyal to this group of Native Americans and following established precedent, this Court has chosen not to construe the Treaty according to the probable understanding of the Indians, has chosen not to give broad scope to the Indians' hunting rights, and has chosen not to avoid interpreting the Treaty to the Indians' prejudice. The Court could only do this by ignoring United States Supreme Court and Idaho precedent, as well as Idaho's Organic Act, in reaching its decision.

In conclusion, our sentiments are those of Supreme Court Justice Hugo Black when he said: "I regret that this Court is to be the governmental agency that breaks faith with this dependent people. Great Nations, like great men, should keep their word." *Federal Power Commission v. Tuscarora Indian Nation*, 362 U.S. 99, 142, 80 S.Ct. 543, 567, 4 L.Ed.2d 584 (1960).

We would only add that great states, constitutionally obligated to uphold federal law, including treaties, as the supreme law of the land, should also fulfill their duty to do so. This Court has not done so today.

## ON DENIAL OF PETITION FOR REHEARING

BISTLINE and HUNTLEY, Justices.

Today's released opinion is a rewrite of an earlier opinion—now withdrawn by the Court—in an attempt to address substantive issues raised by the defendants in an articulate and extensive petition for rehearing. Rather than grant the petition, which we voted to do, the majority in its new opinion attempts to answer the issues raised by the defendants. When one compares the two opinions, however, it is readily apparent that today's rewrite is nothing but a recycling of that which it wrote the first time around. Nothing has changed—century-old rights enjoyed by Indians of this state are still being extinguished; constitutional provisions are still being ignored; United States Supreme Court and Idaho precedent are still being grossly misapplied; and this Court is still breaking faith with a people who have been conspicuous and unfaltering in loyalty to the United States and principles of law.

The majority's recycled effort is transparently incorrect for the reasons set forth in our dissenting opinion. Additional errors the majority commits, however, cannot go unanswered, and it is to these we now turn.

### I.

The majority cites to *United States v. Hicks*, 587 F.Supp. 1162 (W.D.Wash.1984), to support its proposition that the defendants' hunting in this case is inconsistent with the state's use of Sand Creek Ranch. Nothing could be more incorrect. Although the district court in *Hicks* did hold that the hunting of Roosevelt elk within Olympic National Park by Quinault tribal members was incompatible with the use of the land, the analysis and reasons upon

which it based its decision, far from supporting the majority here, supports the defendants' right to hunt within the Sand Creek Ranch.

In *Hicks* two Quinault tribal members were charged with killing elk within the boundaries of Olympic National Park. The defendants raised Article III of the Treaty with the Qui-Nai-elts (Quinaults), also referred to as the Treaty of Olympia, 12 Stat. 971, as a defense to their prosecution. That provision states that Indians would have the privilege of hunting on "all open and unclaimed lands." [6] In 1938, Congress created Olympic National Park. 16 U.S.C. §§ 251 *et seq.* The question to be answered, then, was whether land within Olympic National Park is still "open and unclaimed" for purposes of hunting under Article II of the Quinault Treaty.

The district court erred in giving scant attention to what the Indians to the Quinault Treaty would have thought "open and unclaimed" meant in entering into the Treaty. Nevertheless, the construction it adopted for the term is very broad:

> The construction of "open and unclaimed lands" that best accommodates Indian hunting as settlement occurs *and matures* is that "open and unclaimed lands" include public lands put to uses consistent with an Indian hunting privilege. Lands cease to be "open and unclaimed" when they are put to uses incompatible with hunting. This broad construction of "open and unclaimed lands" contemplates hunting among multiple uses with which it is compatible yet precludes it where it is not compatible. *Hicks, supra,* at 1165–66 (emphasis in original).

The district court applied this construction to the facts of the case in holding that lands within Olympic National Park are not "open and unclaimed." Those facts do not exist in this case.

The district court extensively quoted congressional reports and legislation for the proposition that one of the primary reasons the Park was established was to permanently protect mature Roosevelt elk—a species of elk that had been "rapidly decreasing in numbers." Proclamation of March 2, 1909, 35 Stat. 2247. In addition, the court also held that the enactment of 16 U.S.C. § 256b, which prohibits hunting in Olympic National Park, effectively accomplishes the withdrawal of Olympic National park land from that which is "open and unclaimed." Thus, for these two reasons, the district court held that Indian hunting within the Park was incompatible with the purpose for which the land was being used.

Neither of these crucial facts appears in this case. The Sand Creek Ranch was not established to preserve and protect elk and other game from hunting. The fact that the state seeks to protect such game in the winter months is a qualitatively different type of protection being afforded than that granted Roosevelt elk. The Roosevelt elk were a species facing extinction; elk in this state are not. Readily apparent, then, is the fact that Olympic National Park was intended to be a *refuge* for Roosevelt elk. The same is not true with the Sand Creek Ranch—a federally funded wildlife management area in which sport hunting has occurred for decades. Equally clear is the difference between Congress' prohibition of *all* hunting within Olympic National Park and the absence of such prohibition within the Sand Creek Ranch area.

Thus, nothing in *Hicks* lends credence to the majority's unsupportable statement that hunting in Sand Creek Ranch is incompatible with the use of that land. Hard as it may try, the majority cannot produce one valid, sustaining reason why Indian hunting in Sand Creek Ranch is incompatible with the uses of the land. This is under-

---

6. We note that the treaty language of the 1868 Fort Bridger Treaty grants the Eastern Shoshone and Bannock tribes rights to hunt on "unoccupied" lands of the United States. We will not attempt to determine if "open and unclaimed" and "unoccupied" grant similar rights.

Such is not necessary, for the *determinative factor* in interpreting these treaty rights is the *Indians' understanding of their meaning. Washington v. Fishing Vessels Ass'n,* 443 U.S. 658, 678, 680–81, 99 S.Ct. 3055, 3071–72, 61 L.Ed.2d 823 (1979).

464

standable, however, in light of the over-whelming evidence, which reveals that hunting within the Ranch *is a compatible use.* Accordingly, rather than support the majority's position, *Hicks* undermines it.

## II.

The majority's decision leads to the type of legal sophistry that Indian jurisprudence has long held should be eschewed. The facts of this case reveal that three of the elk were taken between one-eighth and one-fourth mile west of the Sand Creek Ranch-Targhee National Forest boundary line, and that the defendants had pursued the elk from the national forest onto the Ranch. The fourth elk and one deer were also taken in the same area.

In our dissent we noted that this Court, as well as many other federal and state courts, has held that National Forest Lands are "unoccupied lands" for purposes of construing either the Fort Bridger Treaty or other treaties with similar or identical phraseology. *See ante* pp. 860–861. By ruling as it does, the majority's opinion produces the illogical anomaly that Indians will face prosecution only if they cross the Sand Creek Ranch-Targhee National Forest boundary line and kill an elk or deer within the Ranch area, despite the fact that the land is managed virtually the same on both sides of the boundary line and Indians continue to have such hunting rights within the National Forests. Can anyone reasonably argue that this is what the Shoshone-Bannock tribes contemplated when they entered into the 1868 Treaty?

## III.

The majority's use of historical evidence to buttress its conclusions should turn all historians on their heads. The majority narrowly focuses on only part of the record to reach conclusions that are skewed and off-based. It states:

It is apparent from the record that the signatory Indians understood that their off-reservation hunting rights reserved in the treaty were not absolute and would diminish with the increased occu-

pation of the lands and the decrease in available game.
*Ante,* p. 858.

Such a conclusion is a far cry from what this Court concluded in *State v. Tinno,* 94 Idaho 759, 762, 497 P.2d 1386, 1389 (1972), where, after examining the very same minutes and notes the majority today says it examined, this Court stated:

Those notes reflect the true concern of the tribal negotiators, recognized by the government agents, that the signatory Indians were facing a major change in their way of life and *that their traditional food gathering would have to be insured in the future.* (Emphasis added.)

The majority also reaches its present conclusion by relying upon author Grace Raymond Hebard's opinion of Chief Washakie. We find it remarkable that the majority is willing to elevate to a factual conclusion this *undocumented* and *irrelevant opinion* written some *63 years after* the 1868 Treaty had been entered into.

Finally, the majority quotes Chief Tahgee's remarks. Several crucial problems exist with this quote. First, the remarks were not made during negotiations on a previously unratified treaty. Rather, they were made to Territorial Governor David Ballard in the context of an "article of agreement" between the two parties. This article of agreement was entered into despite the fact that Governor Ballard stated that he had not been authorized to represent or negotiate for the federal government any sort of agreement.

Second, this "article of agreement" *contains no provision* concerning retention of off-reservation hunting rights by the Bannocks. How then Chief Tahgee's quote can be relevant at all in indicating his understanding of "reserved hunting rights under a proposed treaty closely related ... to the Fort Bridger Treaty," *ante,* p. 858, n. 2, requires a creativity of mind we do not possess.

Third, the quote is taken out of context. The complete quote, which was translated

by Governor Ballard into English, is an eloquent and revealing indictment of the white settlers' callous treatment of Chief Tahgee and his people. Years of frustration and anguish that Chief Tahgee and his people had experienced in being hounded, cheated, and demeaned by the white settlers had, no doubt, welled up inside, and in this 1867 meeting with Governor Ballard—the first time Chief Tahgee had been given an opportunity to speak to a representative of the United States—he said in full:

> I thought when the white people came to Soda Springs and built houses and put Soldiers in them it was to protect my people, but now they are all gone, and I do not know where to go, nor what to do; the white men have come into my country, and have not asked my consent. Why is this—and why have no persons talked to me before? I have never known what the white people wanted me to do—I have never killed white men who were passing into my Country. What you say now I will never forget. All my people [the Bannocks] will obey me, and be good, but the "Sheep Eaters" are not my people; they may Steal, but I am not responsible for them, I will answer for the Bannocks. The Boises and Bruneaus are poor, they cannot travel far, they have no horses for hunting the Buffalo, but they are good Indians, and are my friends.
>
> The Buffalo do not come so far south now as formerly, so we must go further to the north to hunt them, the white people have scared them away. I am willing to go upon a reservation, but I want the privilege of hunting the Buffalo for a few years. When they are all gone then we hunt no more, perhaps one year, perhaps two or three years, then we stay on the reservation all the time.
>
> I want the reservation large enough for all my people and no white men on it, except the Agent, other officers and employees of the Government. I want the right-of-way for my people to travel when on the way to and from the Buffalo Country, and when going to sell their furs and skins. I want the right to camp and dig roots on Camas prairie, when coming to Boise City to trade. Some of my people have no horses; they could remain at Camas prairie while others went on to Boise.
>
> Our hunting is not so good as it used to be, or my people so numerous. I will go from here to the Buffalo Country; there I will meet all my tribe, and will tell them of this talk, and of the arrangements we may make. I am willing to go onto the reservation as you propose, but when will you want us to go? We could go next Spring.

B. Madsen, *The Northern Shoshoni* 52 (1980).

The historical evidence the majority relies upon is impotent. The conclusions the majority reaches amount to grand-scale historical revision. The simple truth is that the Indians who entered into the Fort Bridger Treaty did not understand "unoccupied" to mean what the majority claims they did. What they did understand is that which we have documented in our dissenting opinion.

## IV.

Today's opinion is a disaster in terms of history, law, reason, and logic. We conclude by reiterating that which we said when we first wrote our dissent: that we stand as witnesses to a travesty in Indian jurisprudence and the continued tragic and abysmal disregard for Indian rights by a court of law.

## ON DENIAL OF SECOND PETITION FOR REHEARING

BISTLINE, Justice, dissenting.

When Alexis De Tocqueville over a century ago observed with regard to the rights of Indians in their native land:

> If we consider the tyrannical measures which have been adopted by the legislatures of the ... states, the conduct of their governors, *and the decrees of their courts of justice,* we shall be convinced that the entire expulsion of the Indians is

the final result to which the efforts of their policy are directed.

he not only wrote [1] of what he saw at that time, but prophesied today's majority opinion.

1. Alexis De Tocqueville, *Democracy in America,* Phillips Bradley (ed.) (New York: Alfred Knopf, Inc., 1944).